## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                :
**AHMED ABDEL-RAOUF, M.D.** :          **CIV. NO.**
                                :
**v.**                          :          **JURY DEMANDED**
                                :
**YALE UNIVERSITY**             :          **MAY 23, 2012**
_____:


## COMPLAINT

Dr. Abdel-Raouf Ahmed Abdel-Raouf, M.D. (hereinafter "Dr. Abdel-Raouf" and/or "Dr.

Abdel-Raouf") brings this action against his former employer Yale University (hereinafter

"Defendant") seeking money damages and other legal and equitable remedies against said

defendant for unlawfully discriminating and retaliating against him pursuant to 42 U.S.C. §

1981; 42 U.S.C. § 2000e et.seq.

**I.      PARTIES**

1.      Dr. Abdel-Raouf is a resident of the State of Connecticut.

2.      Defendant Yale University is Connecticut Corporation, having a place of business at 15

York Street, New Haven, Connecticut 06510, 2 Whitney Avenue, New Haven, Connecticut

06510 and 300 George Street, Suite 901, New Haven, Connecticut 06511.

**II.     JURISDICTION AND VENUE**

3.      Jurisdiction over the subject matter of this litigation exists under, 28 U.S.C. § 1331,

42 U.S.C. § 1981 and 42 U.S.C. § 2000e et.seq.  As to Dr. Abdel-Raouf's common law claims,

this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut and both parties reside in the District.

## III.    PROCEDURAL PREREQUISITES

5.      On June 28, 2011, Abdel-Raouf filed a of discrimination against Defendant with the Boston Area Office of the Equal Employment Opportunity Commission (EEOC), Charge No. 523-2011-00574.

6.      On May 3, 2012, Dr. Abdel-Raouf received a Notice of Right to Sue letter from the EEOC. (Exhibit A).

7.      All administrative prerequisites to the institution of this action have been satisfied.

## IV.    STATEMENT OF FACTS

8.      On July 2009, Dr. Abdel-Raouf became employed by the Defendant in the Psychiatry Department.  Dr. Abdel-Raouf had graduated from Cairo University School of Medicine in December 1986 and Wake Forest University Graduate School of Arts and Sciences in December 2003.  Dr. Abdel-Raouf received a salary in the amount of $58,500.00 per year, plus expenses. Dr. Abdel-Raouf reported this income on his federal and state tax returns.

9.      During the period of time from July 1, 2009 to September 30, 2009, Dr. Abdel-Raouf worked a rotation in the Inpatient psychiatry at Connecticut Mental Health Center (CMHC) 4th Floor with his supervisor Dr. Beech.

10.     During the period of time from October 1, 2009 to November 30, 2009, Dr. Abdel-Raouf worked a rotation in the Consultation-Liaison (C-L) Service at the West Haven veteran administration (VA) hospital with his supervisor Dr. Chiles.

2

11.     On October 11, 2009, Dr. Abdel-Raouf received a Review and rated a (3.5), which is above average, from his supervisor Dr. Robert Beech.

12.     On November 5, 2009, the Fort Hood Shooting Incidence occurred at the Fort Hood Army Base outside of Killeen, Texas and broadcast nationally on the news. A U.S. Army Major and Psychiatrist, Nidal Malik Hasan, shot and killed thirteen innocent bystanders and wounded twenty-nine others.  Dr. Hasan was an American Muslim of Palestinian descent.

13.     Immediately after and in direct reaction to the Fort Hood Shooting, in November 2009, his supervisor Dr. Chiles told Dr. Abdel-Raouf "we have to evaluate you very carefully and keep a close eye on you because of this incident and if the soldier was evaluated thoroughly during his training, these killings and the lives lost would never have happened." The only meaning derived from this statement is that because Dr. Abdel-Raouf is a Muslim of Arab decent, Dr. Chiles believed he too would commit a terrorist act and kill individuals at Yale University. Dr. Abdel-Raouf confronted his accuser/supervisor Dr. Chiles and asked not to be discriminated against, a protected activity.  Dr. Abdel-Raouf emphatically pleaded, "It is not my fault, please don't hurt me, don't destroy my life and my career". Dr. Abdel-Raouf is a Muslim Arab American from Egypt. On information and belief, Dr. Chiles has received prior complaints regarding her dislike of foreigners.  On information and belief, Dr. Chiles never received any disciplinary action as a result of her unlawful conduct. During this exact time period, Dr. Chiles also supervised another African American resident. Dr. Chiles never made any similar or identical discriminatory remarks to this other minority employee. Dr. Chiles intended and did so destroy Dr. Abdel-Raouf's employment and career opportunities because of her racial and religious bigotry.

14.     On November 30, 2009, Dr. Chiles told the program director, Dr. Rohrbaugh and the Veteran's Administration (VA) hospital psychiatry training director, Dr. Vojvoda, that Dr.

3

Abdel-Raouf  is not a good psychiatrist and they "should keep a close eye on him." A retaliatory adverse employment action. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

15.     On December 2, 2009, Dr. Abdel-Raouf received a Poor review from Dr. Chiles. This was an adverse employment action because the review was used by Defendant in rendering a decision to have Dr. Abdel-Raouf repeat the second year residency program and later termination. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

16.     During the period of time from December 1 to December 31, 2009, Dr. Abdel-Raouf worked in the Emergency Psychiatry rotation at the VA hospital with his supervisor Dr. Mellos.

17.     On or about December 2009,  Dr. Vojvoda met with Dr. Abdel-Raouf and directed him to meet with Dr. Okasha for more supervision. Although acting as his supervisor, Dr. Okasha never provided supervision of Dr. Abdel-Raouf's employment, but only interrogated Dr. Abdel-Raouf regarding his background, race and religious practices.

18.     On or about December 2009,  Dr. Okasha interrogated Dr. Abdel-Raouf, and asked about his past and present religious practices, his family, his friends, any legal history including time spent in Egypt, asked his opinion about Yale's faculty, staff and reason for moving to Yale. Dr. Abdel-Raouf was illegally and discriminatorily profiled based on his race and religion.  It was obvious that the Defendant was taking unlawful efforts to profile Dr. Abdel-Raouf and determine whether he was a terrorist, had terrorist tendencies, whether he was affiliated with a Muslim extremist group, and whether he had any negative opinions of Yale and its faculty.  There was no evidence in the factual record up to this date that Dr. Abdel-Raouf had engaged in any misconduct on or off campus.

4

19.     On January 13, 2010, Dr. Abdel-Raouf received a Review with a rating of (4), which is above average, by his supervisor Dr. Nick Mellos. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

20.     On February 2010, Dr. Abdel-Raouf met with Dr. Diaz, Associate Program Director and told about Dr. Chiles' discriminatory remarks. Dr. Abdel-Raouf engaged in a protected activity.

21.     On or about February 2010, Dr. Abdel-Raouf tells Dr. Okasha about Dr. Chiles' remarks. Dr. Okasha stated, "This is wrong, a professor at Yale should not say anything like that and this is a clear discriminatory attitude." Dr. Abdel-Raouf engaged in a protected activity.

22.     Approximately, one week later Dr. Okasha told Dr. Rohrbaugh about Dr. Chiles' remark, and told Dr. Abdel-Raouf "don't be afraid, nothing will happen to you and the program director needs to know, this is not the first time Dr. Chiles [made remarks or discriminated against foreign resident] Dr. Okasha stated, "it is time this stopped." Dr. Abdel-Raouf engaged in a protected activity.

23.     On March 11, 2010, Dr. Abdel-Raouf attended language remediation course as instructed by his supervisors, a common practice for employees of foreign descent with English as a second language.

24.     On or about March 2010,  Dr. Abdel-Raouf worked a Substance Abuse Rotation at the VA hospital for six weeks with his supervisors Dr. Drew and Dr. Pikley

25.     On March 21, 2010, Dr. Abdel-Raouf receives a Review with a rating of (4.5), which is superb from his supervisor Dr. Matthew Shaw. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

26.     On about March 2010, Dr. Abdel-Raouf worked a Geriatric Psychiatry Rotation at the VA hospital for six weeks with his supervisors Dr. Conroy and Dr. Kirwin.

27.     On or about April 2009, Dr. Diaz apologized to Dr. Abdel-Raouf about Dr. Chiles'

remarks and admitted nothing should happen to him at Yale. He further admitted this was a clear

discriminatory act and in violation of Yale's antidiscrimination policy. Dr. Diaz further admitted

that Dr. Chiles did confirm and admit to making the discriminatory remark. Dr. Abdel-Raouf

engaged in a protected activity.

28.     On April 2, 2010, Dr. Abdel-Raouf received a Review with a rating of (4.5), which is

superb, from his supervisor Dr. Mathew Shaw. There was no evidence in the factual record as of

this date that demonstrated Dr. Abdel-Raouf's poor performance.

29.     During the period from April 1 to June 30, 2009, Dr. Abdel-Raouf worked an Inpatient

Psychiatry Rotation at the VA hospital for twelve weeks with his supervisors Dr. Lewis and Dr.

Phan.

30.     On April 5, 2010, Dr. Abdel-Raouf received a Review with a rating of (3.5), which is

above average, by his supervisor Dr. Michelle Conroy. There was no evidence in the factual

record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

31.     On April 8, 2010, Dr. Abdel-Raouf received a Review with a rating of (3.5), which is

above average, by his supervisor Dr. Paul Kirwin. There was no evidence in the factual record as

of this date that demonstrated Dr. Abdel-Raouf's poor performance.

32.     On April 20, 2010 Dr. Abdel-Raouf met with Dr. Rohrbaugh and who made no mention

of poor performance. Dr. Rohrbaugh admitted and apologized about Dr. Chile's discriminatory

remark. Dr. Abdel-Raouf warned him that Yale would adopt unwritten practices and closely

monitor his behavior. Dr. Rohrbaugh agreed one could think that. Dr. Abdel-Raouf engaged in a

protected activity.

33.     On May 2010, Dr. Abdel-Raouf finished language remediation course.

34.     On May 7, 2010, Dr. Abdel-Raouf received a positive review with average ratings, by his supervisor Dr. Shannon Drew. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

35.     On May 12, 2010, Dr. Abdel-Raouf received a Review with a rating of (4), which is superb, by his supervisor Dr. David Pilkey. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

36.     On May 28, 2010, Dr. Abdel-Raouf received a letter from Dr. Rohraugh, program director, and Dr. Diaz, associate program director. Dr. Abdel-Raouf was informed he was not promoted to PGY3 (the third year residency program of employment) and directed to repeat PGY2 (the second year residency program of employment), an adverse employment action directly related to Dr. Chiles discriminatory remarks and Dr. Abdel-Raouf's protected activity complaining on several separate occasion to Dr. Chiles, Dr. Diaz, Dr. Okasha and Dr. Rohrbaugh. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

37.     On May 28, 2010, Dr. Abdel-Raouf develops situational depression, loses twenty pounds, has problems sleeping, felt hopeless, helpless and worthless; and has a loss of interest and loss of pleasure in enjoyment of life. Dr. Abdel-Raouf had never been diagnosed with any mental condition or disorder prior to this date. Nor did he seek treatment for any mental condition or disorder prior to this date.

38.     During June, 2010, Dr. Abdel-Raouf traveled home to Egypt for 2 weeks vacation. However, due to his depression and anxiety about having to repeat his entire second year of residency, Dr. Abdel-Raouf stayed in bed his entire vacation while home as a consequence of his depressed and hopeless feeling.

39.     During the period of time from July 1, 2010 to September 29, 2010, Dr. Abdel-Raouf

worked the Inpatient Psychiatry Rotation Yale Psychiatric Hospital (YPH) for twelve weeks with

Dr. Milstein.

40.     On August 30, 2010, Dr. Abdel-Raouf received a poor performance review from Dr.

Susan Lewis. This evaluation was delayed for two months after the rotation, which ended in

June, which clearly was used and arranged by the administration to terminate Dr. Abdel-Raouf's

employment and in retaliation for complaining about Dr. Chiles discriminatory remarks. There

was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor

performance.

41.     On September 17, 2010, Dr. Abdel-Raouf received a positive performance review, with a

rating of (3.5), which is above average, from his supervisor Dr. Rajesh Tampi. There was no

evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor

performance.

42.     On September 19, 2010, Dr. Abdel-Raouf received a performance review from Dr.

Okasha which contained no rating. There was no explanation for the failure to provide a rating.

On information and belief, Dr. Okasha supervision was used only to collect private information

about Dr. Abdel-Raouf to be transferred to the program director and the administration of the

psychiatry department for analysis. There was no evidence in the factual record as of this date

that demonstrated Dr. Abdel-Raouf's poor performance.

43.     On September 21, 2010, Dr. Abdel-Raouf received a poor performance review from his

supervisor Dr. Tek, an adverse employment action. The review was used to terminate his

employment. A day prior, during a meeting with Dr. Tek, she stated to Dr. Abdel-Raouf, "you

made me mad, I supervised you for free and the department is not paying me for to doing this; I

was a psychiatric patient before and I would not like you to be my doctor; you're not grateful to us and we will stop you from going on with your residency." During a subsequent meeting with her, Dr. Abdel-Raouf tried to discuss the review with Dr. Tek, but she again burst into anger unexpectedly; she asked him to leave her office and then proceeded to kick him out of her office. Dr. Tek violated and ignored regular evaluation procedure by refusing to discuss the evaluation with Dr. Abdel-Raouf, as per the guideline specified in the directory of Graduate Medical Education Program under the  of the Accreditation Council for Graduate Medical Education (ACGME). Dr. Abdel-Raouf passed three out of four of Dr. Tek's psychiatric clinical skills encounters, despite receiving an alleged poor evaluation. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

44.     On September 29, 2010, Dr. Abdel-Raouf received a letter from Dr. Rohraugh and Dr. Diaz informing him that he was <u>terminated from his employment</u>, an adverse employment action. There was no evidence in the factual record as of this date that demonstrated Dr. Abdel-Raouf's poor performance.

45.     On October 2010, Dr. Abdel-Raouf received the PRITE exam results, he attained an overall rating of 94 percentile based on a national ranking of all second year residents and 91 percentile based on a national ranking of all years psychiatry residents.

46.     On November 10, 2010, Dr. Abdel-Raouf received a letter from James Tierney regarding his language remediation progress.

47.     On November 12, 2010, Dr. Abdel-Raouf received an Audiological Evaluation. He was diagnosed with bilateral high frequency sensorineural hearing loss of mild to moderate degree. He was recommended to wear a hearing aid.

48.    On November 19, 2010, Dr. Abdel-Raouf filed an Appeal with the University regarding

his termination from employment.

49.    On November 24, 2010, Dr. Okasha provided Dr. Abdel-Raouf with a positive

recommendation letter as PGYII resident, evidencing his qualifications for employment. Dr.

Okasha stated,

> I have had the opportunity and pleasure in supervising Dr. Ahmed Abdel-Raouf for five
> months during his PGYII psychiatric rotation in the department of psychiatry at Yale
> University Medical School. Ahmed is a very nice, polite and personable resident. He is
> extremely hard working and dedicated to his work. He shows empathy with his patients,
> especially the older patients (he would like to specialize in geriatric psychiatry). He is
> eager to learn, motivated, and has an excellent knowledge of internal medicine. I believe
> he is a solid PGYII resident and I would recommend him to your program without
> hesitation.

50.    On January 3, 2011, Defendant denied Dr. Abdel-Raouf's employment Appeal, an

adverse employment action. In the denial letter, Dr. Krystal, Chair of the Department of

Psychiatry, states that part of the decision to deny the appeal was based on Dr. Abdel-Raouf's

performance on the PRITE exam.  Specifically, with respect to the Dr. Abdel-Raouf's ability to

communicate in a clinical setting, Dr. Abdel-Raouf scored in the 15th percentile.  In the prior

year, Dr. Abdel-Raouf scored in the 79th percentile nationally.   Dr. Krystal failed to mention that

25% of all Yale psychiatry residents scored even lower that Dr. Abdel-Raouf in the area of

patient evaluation and treatment selection. Of these residents, all of them were permitted to

transfer to the third year residency program, only Dr. Abdel-Raouf was instructed to repeat his

second year.

51.    On March 17, 2011, Dr. Abdel-Raouf received a positive letter of a recommendation

from Dr. Rajesh Tampi. Dr. Tampi stated in pertinent part,

> I was assigned as Dr. Raouf's educational supervisor from July 2010 through September
> 2010. From the very beginning, Dr. Raouf impressed me with his personal and

professional attributes. He was always very respectful and pleasant in my interactions with him. He was always on time for his supervision and did all the assigned readings. He worked diligently on improving his psychiatric knowledge base and translated that into an excellent performance on the PRITE 2010. He was in fact not only a top performer on the PRITE at our program but also nationwide.

52.    On June 28, 2011, Dr. Abdel-Raouf filed his charge of employment discrimination and retaliation with the United States Equal Employment Opportunity Commission.

53.    On July 18, 2011, Dr. Abdel-Raouf received a letter from Linda Mayes at Yale regarding his appeal.

54.    On February 6, 2012, Dr. Abdel-Raouf received a letter from Dr. Robert Alpern, Dean School of Medicine, denying his employment appeal, an adverse employment action.


## V.    COUNT ONE:         RACE DISCRIMINATION PURSUANT TO 42 U.S.C. § 1981


55.    Dr. Abdel-Raouf hereby repeats and realleges paragraphs 1 to 54 as if fully pleaded herein.

56.    Defendant's conduct, by and through its agents, in treating Abdel-Raouf in the manner unequal to other employees, discriminatorily denied Dr. Abdel-Raouf equal treatment on the basis of his race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of his employment. Section 1981 provides as follows:

a) State of Equal Rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to not other.

(b) Make and enforce contracts defined: For purposes of this section, the term make and enforce contacts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the

11

contractual relationship.

57.     Defendant in failing to adequately investigate and remedy the treatment to which Dr. Abdel-Raouf was subjected, despite the Defendant's knowledge of the conduct, discriminatorily denied Dr. Abdel-Raouf equal treatment on the basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of his employment.  The Dr. Abdel-Raouf's supervisors specifically admit that Dr. Chiles made her discriminatory remarks, at least one remarked "this has got to stop."  In addition, Dr. Abdel-Raouf was subjected to a racially hostile work environment that was permeated with discriminatory intimidation, ridicule and insult.  The harassment Dr. Abdel-Raouf experienced was sufficiently severe and/or pervasive so as to adversely alter his working conditions and cause him intentional emotion distress, depressed feeling and physical harm.  Dr. Abdel-Raouf began taking medication to lower his blood pressure which went sky high after the occurrence of the adverse employment actions above.

58.     The discriminatory acts of the Defendant as described above were intentional and were substantially motivated on the basis of Dr. Abdel-Raouf's race.

59.     As a result of the Defendant's conduct, Dr. Abdel-Raouf has suffered and will continue to suffer past and future economic, physical and emotional harm.

## VI.    COUNT TWO:      RETALIATION PURSUANT TO 42 U.S.C. § 1981

60.     Dr. Abdel-Raouf hereby repeats and realleges paragraphs 1 to 59 as if fully pleaded herein.

61.     Defendant conduct, by and through its agents, in retaliating against Dr. Abdel-Raouf denied Abdel-Raouf equal treatment on the basis of race in violation of 42 U.S.C. § 1981 for engaging in protected activities when he complained, first to Dr. Chiles upon hearing her discriminatory remarks, and then to his supervisors.

62.     Defendant, in failing to adequately investigate and remedy the treatment to which

Dr. Abdel-Raouf was subjected to, despite the Defendant's knowledge of the conduct,

discriminatorily denied Dr. Abdel-Raouf equal treatment on the basis of race in violation of 42

U.S.C. § 1981 in the terms, conditions and privileges of his employment.

63.     Moreover, once Dr. Abdel-Raouf discovered and witnessed the racist actions by the

Defendant and its employees, he immediately protested such racism. The Defendant then

retaliated against Dr. Abdel-Raouf, altering his terms, conditions and privileges of employment,

ordering him to repeat his second year of the residency program, providing negative performance

reviews, eventually terminating his employment. Defendant's retaliatory conduct violated 42

U.S.C. § 1981.

64.     The retaliatory acts of the Defendant as described above were intentional, willful and

were motivated on the basis of Dr. Abdel-Raouf's protected activity.

65.     As a result of Defendant's conduct, Dr. Abdel-Raouf has suffered and will continue to

suffer past and future economic, physical and emotional harm.

**VII.     COUNT THREE:     RACE DISCRIMINATION PURSUANT TO
                            42 U.S.C. § 2000e**

66.     Dr. Abdel-Raouf hereby repeats and realleges paragraphs 1 to 65 as if fully pleaded

herein.

67.     Defendant's conduct, by and through its agents, in treating Dr. Abdel-Raouf in the

manner unequal to other employees, discriminatorily denied Dr. Abdel-Raouf equal treatment on

the basis of race in violation of 42 U.S.C. § 2000e.

68.     Defendant's in failing to adequately investigate and remedy the treatment to which Dr.

Abdel-Raouf was subjected, despite the Defendant's knowledge of the conduct, discriminatorily

denied Dr. Abdel-Raouf equal treatment on the basis of race and religion in violation of 42 U.S.C. § 2000e. In addition, Dr. Abdel-Raouf was subjected to a racially, religious and discriminatory hostile work environment that was permeated with discriminatory intimidation, ridicule and insult. The harassment Dr. Abdel-Raouf experienced was sufficiently severe and/or pervasive so as to adversely alter his working conditions and cause him intentional emotional distress.

69.     The discriminatory acts of the Defendant as described above were intentional and were substantially motivated on the basis of Dr. Abdel-Raouf's race and religion.

70.     The Defendant engaged in a pattern and practice of intentional discrimination, which was the Defendant's standard operating procedure. The Defendant subjected Dr. Abdel-Raouf to a hostile work environment that started with Dr. Chiles discriminatory comments and ended with Dr. Abdel-Raouf's last denial of his employment appeal. Dr. Abdel-Raouf's workplace was permeated with discriminatory intimidation that was sufficiently severe and pervasive to alter the conditions of his work environment. There further exists a specific basis for imputing the conduct that created the hostile environment to the employer, as the adverse actions experienced by Dr. Abdel-Raouf were caused solely by his supervisors and higher level administrators. All of the actions that occurred within this time period were part of one continuous ongoing hostile work environment perpetuated by the Defendant because of Dr. Abdel-Raouf's race and religion. Such that collectively the adverse employment actions constitute one unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1).

71.     As a result of the Defendant's conduct, Dr. Abdel-Raouf has suffered and will continue to suffer past and future economic, physical and emotional harm.

**VIII.   COUNT FOUR:        RETALIATION PURSUANT TO 42 U.S.C. § 2000e**

72.     Dr. Abdel-Raouf hereby repeats and realleges paragraphs 1 to 71 as if fully pleaded

herein.

73.     Defendant's conduct, by and through its agents, in retaliating against Dr. Abdel-Raouf

denied Dr. Abdel-Raouf equal treatment on the basis of race and religion in violation of 42

U.S.C. § 2000e.

74.     Defendant, in failing to adequately investigate and remedy the treatment to which

Dr. Abdel-Raouf was subjected to, despite the Defendant's knowledge of the conduct,

discriminatorily denied Dr. Abdel-Raouf equal treatment on the basis of race and religion in

violation of 42 U.S.C. § 2000e.

75.     Moreover, once Dr. Abdel-Raouf discovered and witnessed the race and religious

discriminatory actions by the Defendant and its employees, he immediately protested such

discrimination first to Dr. Chiles and then to his supervisors. The Defendant then retaliated

against Dr. Abdel-Raouf, altering his terms, conditions and privileges of employment, causing

him to repeat his second year residency program and eventually terminating his employment.

Defendant's retaliatory conduct violated 42 U.S.C. § 2000e.

76.     The retaliatory acts of the Defendant as described above were intentional, willful and

were motivated on the basis of Dr. Abdel-Raouf's protected activity. The Defendant's actions

were harmful to the point that they could dissuade a reasonable employee from making or

supporting a charge of discrimination.

77.     The Defendant engaged in a pattern and practice of intentional discrimination, which was

the Defendant's standard operating procedure.  The Defendant subjected Dr. Abdel-Raouf to a

hostile work environment that started with Dr. Chiles discriminatory comments and ended with

Dr. Abdel-Raouf's last denial of his employment appeal. Dr. Abdel-Raouf's workplace was permeated with discriminatory intimidation that was sufficiently severe and pervasive to alter the conditions of his work environment. There further exists a specific basis for imputing the conduct that created the hostile environment to the employer, as the adverse actions experienced by Dr. Abdel-Raouf were caused solely by his supervisors and higher level administrators. All of the actions that occurred within this time period were part of one continuous ongoing hostile work environment perpetuated by the Defendant because of Dr. Abdel-Raouf's race and religion. Such that collectively the adverse employment actions constitute one unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1).

78.     As a result of Defendant's conduct, Dr. Abdel-Raouf has suffered and will continue to suffer past and future economic, physical and emotional harm.

## IX.     COUNT FIVE:          PENDENT CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

79.     Dr. Abdel-Raouf hereby repeats and realleges paragraphs 1 to 78 as if fully pleaded herein.

80.     The unlawful employment actions alleged herein were the direct result of the Defendant's actions to intentionally inflict emotional distress and physical harm, or that Defendant knew or should have known that such distress was a likely result of their conduct.

81.     Dr. Abdel-Raouf's allegations of employment discrimination caused by the Defendant were so extreme and outrageous as to offend the common decency of any similarly situated individual in his position.  No employee should be subjected to direct racial discrimination and retaliation of the type alleged herein.  It is patently offensive to permit the use of racial discrimination in the workplace or retaliation against those who protest against the same,

especially if the racial discrimination is spoken by Dr. Abdel-Raouf's supervisor. Defendant's reference to Dr. Abdel-Raouf as set forth above clearly surpasses mere insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners. It is further patently offensive for the Defendant to constantly condition Dr. Abdel-Raouf's terms, conditions and privileges of employment based on his race, religion, national origin, and protected activity.  There is a limit to the mistreatment employees must endure before having grounds to seek redress in the courts, Dr. Abdel-Raouf has suffered beyond this limit because the Defendant's actions were outrageous.

82.     The Defendant possessed knowledge that the employment discrimination alleged herein directly violated the Defendant own employment policies, but did nothing to remedy each and every violation.

83.     Dr. Abdel-Raouf has experienced severe emotional, psychological, and physical injuries as a direct and proximate cause of the Defendant's actions.

84.     As a result of Defendant's conduct, Dr. Abdel-Raouf has suffered and will continue to suffer past and future economic, physical and emotional harm, fear, humiliation, and loss of self-esteem.


**WHEREFORE**, Dr. Abdel-Raouf is seeking:

1.     Compensatory damages, including loss of enjoyment of life, depressed feeling**,** emotional and physical pain and suffering, back pay, bonuses, and the value of all other employment benefits in an amount to be determined by the trier of fact, with interest from the date when said sums were due;

2.      Compensatory and Punitive damages pursuant to 42 U.S.C. § 1981 et.seq.; 42 U.S.C. § 2000e et.seq.;

3.      An order directing Defendant to reinstatement Dr. Abdel-Raouf to his former position or, in the alternative, front pay for seven (7) years;

4.      Common law punitive damages;

5.      Award attorneys fees;

6.      Prejudgment interest and costs;

7.      An injunction permanently enjoining the Defendant, its agents, employees, successors, assigns and all persons who acted in concert and participation with the Defendant, from engaging in any employment practice which discriminates on the basis of race;

8.      An Order that the Court retain jurisdiction over this action until the Defendant has fully complied with the Orders of this Court and that the Court require the Defendant to file such reports as may be necessary to supervise such compliance;

9.      A money judgment to recoup any tax loss suffered by Dr. Abdel-Raouf as a result of receiving a lump sum award of back pay and front pay rather than having received wages over a period of years;

10.     Such other and further relief as this Court shall deem just and proper.


## JURY TRIAL DEMANDED

Dr. Abdel-Raouf respectfully requests a jury trial on all questions of fact raised by his complaint.

PLAINTIFF,
AHMED ABDEL-RAOUF, M.D.

By
Mark P. Carey (ct17828)
Mark P. Carey, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel.
(203) 255-0380 fax.
Mcarey@capclaw.com
His Attorney

19

# EXHIBIT A

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: Ahmed Abdel-Raouf<br>421 Sawmill Road, Apt A1<br>West Haven, CT 06516 | From: Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|

☐  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2011-00574 | Linda E. Ingle,<br>Investigator | (617) 565-3194 |

(See also the additional information enclosed with this form.)

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Robert L. Sanders,
Area Office Director

MAY 0 3 2012
. (Date Mailed)

cc:    Jonathan Clune,, Counsel
YALE UNIVERSITY SCHOOL OF MEDICINE -DEPT OF
PSYCHIATRY
P.O. Box 208255
New Haven, CT 06302-8255